ED. B. WIGGINTON et al. v. E. B. RULE et al.,
. Appellants.

Division Two, July 16, 1918.

1. **WILL CONTEST: Testamentary Incapacity: Sufficient Evidence.** The testimony in this case, which was brought by children to set aside the will of their father, seventy-eight years old, made eighteen days before he committed suicide, is set out at length, and the conclusion reached that there was sufficient evidence to authorize the submission of the issue of *devisavit vel non* to the jury.

2. ———: ———: **Delusion: Sufficient Evidence.** The evidence in this case was sufficient to justify a submission to the jury of the question of whether testator. at the time he executed his will, was laboring under an *insane delusion that undue intimate relations* existed between his son-in-law and a young girl who was a member of his family, that such false and mistaken conception was not based upon fact, that he did not have before him evidence acting upon which any normal or rational mind would have formed such belief, and that the will was the offspring of such delusion.

3. ———: ———: **Insane Delusion: Pertinent Evidence.** There is no such thing as a delusion founded upon substantial facts; but it is not sufficient for a ruling as a matter of law that testator possessed no insane delusion, that testimony be produced at the trial that he had some evidence, even though of an unsubstantial character, for his belief that illicit relations existed between his son-in-law and a girl in his family; but the question for determination is, *did he have before him at the time he executed the*

will evidence acting upon which any normal or rational mind would have formed such a belief? If there is testimony from which the jury would be justified in finding that testator was insane on the subject of such an illicit intimacy, and that the will was the fruit of such insanity, then the existence of the delusion at the time the will was made, being a mistaken and false misconception, becomes a question for the jury.

4. ——: ——: **Subsequent Occurrences.** There is no hard-and-fast rule as to the incompetency of evidence on account of remoteness. Post cards written by testator a few days after execution of his will, to his granddaughter, there being no noticeable change in his mental condition between the two events, are competent evidence bearing on his testamentary capacity.

5. ——: ——: **Opinion of Lay Witnesses: Self-Invited Error.** An appellant, who by his conduct at the trial invites the error of which he subsequently complains, whether it be in the instructions asked or the evidence produced, is not on appeal entitled to a ruling that such error was prejudicial. It is an invasion of the province of the jury to permit lay witnesses in a will contest to give their opinions that testator did not have sufficient mind to know the value of his property or to realize his relations towards his children; but if proponents themselves open wide the door to the admission of such opinions and invite them, both by the direct and cross-examination of witnesses, they will not, on appeal be entitled to complain that the admission of the opinions of respondents' lay witnesses was prejudicial error.

6. ——: ——: **Inheritable Interest.** It is not error to refuse to instruct the jury that a granddaughter of testator, a daughter of an insane daughter, named as a devisee, will inherit no interest in his estate if the will is set aside. though it contains a correct statement of the law. It could not aid the jury in determining the issue of testamentary capacity.

7. ——: ——: **Formal Execution.** An instruction telling the jury that the will "was executed in conformity with the provisions of the law relating to the execution of wills" should not be given. Since the law requires a will to be executed by one of sound mind, its meaning is too obscure and uncertain; besides, where there is no controversy about the formal execution of the will, the jury need no instruction on the point.

## Appeal from Pike Circuit Court.—*Hon. Edgar B. Woolfolk,* Judge.

AFFIRMED.

*Robert A. May, J. E. Pew, Frank J. Duvall* and *Hostetter & Haley* for appellants.

(1) The court erred in refusing proponents' instruction directing the jury to find in favor of the will. The testimony showed without contradiction that the testator transacted his business before and after the making of the will in an intelligent, rational and normal manner; that on the day he made the will he understood the business in which he was then engaged; knew the persons who were the natural objects of his bounty, and understood his relations to them; knew what property he owned and of what it consisted and knew what disposition he desired to make of it. The provisions of the will itself are so fair, sane and reasonable that they constitute the strongest possible proof that they emanated from a mind possessing all the elements of testamentary capacity. Therefore the court should have instructed peremptorily to find in favor of the will. Bounds v. Johnson, 192 S. W. 972; Winn v. Grier, 217 Mo. 420; Hamon v. Hamon, 180 Mo. 685; Cash v. Lust, 142 Mo. 630; Sayre v. Princeton, 192 Mo. 95; Gibony v. Foster, 230 Mo. 106; Weston v. Hanson, 212 Mo. 248; Southworth v. Southworth, 173 Mo. 59; McFadin v. Catron, 120 Mo. 252, 138 Mo. 197; Maddox v. Maddox, 114 Mo. 35; Jackson v. Hardin, 83 Mo. 175; Schierbaum v. Schemme, 157 Mo. 1; Hughes v. Rader, 183 Mo. 630; Turner v. Anderson, 260 Mo. 1; Conner v. Skaggs, 213 Mo. 334; Riley v. Sherwood, 144 Mo. 355; Techenbrock v. McLaughlin, 209 Mo. 539; Farmer v. Farmer, 129 Mo. 530; Story v. Story, 188 Mo. 127. (2) The court erred in instructing the jury as to the alleged "insane delusion." The testimony falls far short of establishing the fact that the belief of the testator in the existence of improper relations between his son-in-law and the girl was in point of fact an "insane delusion" within the meaning of the law. "No belief that has any evidence for its basis, is in law an insane delusion." Stull v. Stull, 96 N. W. (Neb.) 202; Conner v. Skaggs, 213 Mo. 348; Sayre v. Trustees Princeton University, 192 Mo.

126; Fulton v. Freeland, 219 Mo. 518.  To invalidate a will it must be produced by the monomania under which the testator was laboring.  Benoist v. Murrin, 58 Mo. 329. The alleged insane delusion in the instant case was directed against the son-in-law; he was not one of the natural objects of the .testator's bounty; he would not have inherited anything had the testator died without a will; there is no testimony that the testator ever at any time intended to will to the son-in-law any property. Therefore it is idle to contend that the will was the offspring of the delusion, conceding it to have been a delusion.  Merrill v. Rush, 33 N. J. Eq. 537; Stockhouse v. Horton, 15 N. J. Eq. 202.  (3)    The admission of postcards, written by testator on the day of and im- mediately prior to his death, was erroneous and very prejudicial.  A declaration of a testator, whether oral or in writing, made after the execution of the will and having no connection with the will or its provisions, and containing as the exhibits complained of in the case at bar, prejudicial matters to the effect that the testator had mistreated and wronged his granddaughter and was remorseful because of such wrong and mistreatment, is highly prejudicial, and is clearly error.  McFadin v. Catron, 120 Mo. 267.  (4)  It was error to permit lay witnesses to testify and give their opinion to the effect that the testator did not have sufficient mind to know the value of his property or to realize his relations toward his children, or to appreciate the obligations to his family, or the relations to his family, because these matters left it for the witness to conclude what were his proper obligations to his family and to his children, and what were the proper relations he should sustain toward them, and was to that extent an invasion of the province of the jury.  Declarations of a testator are proper to be given in evidence only as they bear upon the con- dition of his mind and the state of his affections.  The purpose which they subserve is to furnish an insight into the actual condition of the testator's mind at the very time of the execution of the will.  The more re- mote they are from the date of the execution of the

will the less value is ascribed to them. They are never received as evidence of the truth of the things contained in such declarations. This principle was repeatedly violated during the trial. McFadin v. Catron, 120 Mo. 266.

*Pearson & Pearson* for respondents.

(1) Where there is any evidence of testator's incapacity to make a valid will, whether it be of insanity, partial insanity, or an insane delusion, it is a question of fact, which should be submitted to the jury under proper instructions. Turner v. Anderson, 260 Mo. 16; Wendling v. Bowdin, 252 Mo. 692; Ten Broeck v. McLaughlin, 209 Mo. 538; Mowing v. Norman, 204 Mo. 193. (2) If a delusion existed in testator's mind, and dominated him in making his will, as the jury found there was, and did, then testator was incapable, on that account, of making a valid will. Holton v. Cochran, 208 Mo. 412; Knapp v. Trust Co., 199 Mo. 667; Benoist v. Murrin, 58 Mo. 319. (3) In order that a testator may comprehend the relations which he holds towards those who have claims upon him, no insane delusion should influence his will; unreasonable prejudice against relatives is not ordinarily a ground for invalidating a will, but it may be set aside where the testator's aversion is the result of an insane delusion, and his conduct cannot be explained on any other ground. Buford v. Gruber, 223 Mo. 250; Knapp v. Trust Co., 199 Mo. 668. (4) Whenever a person conceives something extravagant, which has in fact no existence whatever, and he is incapable of being reasoned out of this false belief, it constitutes insanity; and if this delusion relates to his property, he is incapable of making a will. Benoist v. Murrin, 58 Mo. 323; Knapp v. Trust Co., 199 Mo. 667; Buford v. Gruber, 223 Mo. 250; Holton v. Cochran, 208 Mo. 421. (5) Where there is any evidence, that the will is the direct offspring of partial insanity, or an insane delusion, under which the testator was laboring at the time of executing the same, and from which he could not extricate himself, the case should be submitted to the

jury, although testator's general capacity be unimpaired. Knapp v. Trust Co., 199 Mo. 668; Buford v. Gruber, 223 Mo. 251. (6) The opinion of witnesses, as to testator's mental capacity is the very best evidence that can be adduced before a jury. It approaches to knowledge, and is such knowledge as is proper evidence for the jury. Appleby v. Brock, 76 Mo. 316; Sharp v. K. C. Cable Ry. Co., 114 Mo. 100; State v. Speyer, 194 Mo. 468; Huffman, 217 Mo. 230.

WILLIAMS, J.—This is a suit to set aside, on the ground of testamentary incapacity, the will of Calvin Wigginton, deceased. Trial was had before a jury in the circuit court of Pike County, which resulted in a verdict and judgment setting aside the will. Thereupon the executor and the nieces of testator, who are made defendants in this case, duly perfected an appeal to this court.

The main contention of appellants is that there was not sufficient evidence to submit to the jury the question of testamentary incapacity. For that reason it will be necessary to set forth the facts with considerable detail.

It will be unnecessary to detail the evidence offered by the proponents of the will, since no issue on this appeal is based thereon. In that behalf it is sufficient to say that proponents introduced substantial evidence tending to show that testator was of sound mind at the time the will was made, and that the will was duly executed and witnessed as required by law.

Calvin Wigginton (who for the sake of brevity will be hereinafter referred to as testator) was seventy-eight years of age when he executed his will on August 8, 1914. Eighteen days later he committed suicide by shooting himself in the head with a pistol at a lumber-yard in Clarksville, Missouri.

At the time of his death it is stated that he was possessed of real and personal property of the value of about thirty thousand dollars. He left surviving him only two children, a son, Ed. B. Wigginton, and an insane daughter, Ada V. Goodman, wife of Edwin Good-

man.    These two children are the plaintiffs in this suit; the insane daughter appearing by her guardian, Edwin Goodman.

The will, after providing for the payment of debts and funeral expenses and after stating that testator had already provided for his son, Ed. B. Wigginton, during his lifetime, disposed of testator's property as follows:

"All the rest, residue and remainder of my estate, whatsoever, and wherever situate, I direct shall be held in trust by my executor, hereinafter named and to be loaned as, in his judgment, may be to the best advantage, the income of which shall be paid by him annually, or oftener, if necessary, toward the maintenance of my daughter, Addie V. Goodman, in such sums as may be necessary to properly care for her. And all of such income, over and above what may be necessary to properly provide for my said daughter, shall be paid, annually, to my granddaughter, Mary O. Goodman. And at the death of my said daughter, Addie V. Goodman, the whole of said income shall be paid annually to my said granddaughter, Mary O. Goodman, and in case she shall die leaving no bodily heirs, then I direct that said trust fund shall be distributed as follows: One-sixth thereof to each of the following named persons, to-wit: My son, Ed. B. Wigginton, and my nieces, Callie Elizabeth Thomas, Olca N. Wigginton, Lucy Wells, Juda Wigginton and Zula Wigginton."

E. B. Rule, of Louisiana, Missouri, was named executor. Mary O. Goodman, mentioned in the will, is a granddaughter of the testator and is the only child of the insane daughter. She was named as defendant, together with the executor and the nieces named in the will. Defendant Mary O. Goodman in her separate answer, however, admitted that the testator was not of sound mind at the time the will was made and that he did not have mental capacity to make a will at that time.

Testator had been a widower for many years and for fourteen years had made his home with his son-in-law, Ed Goodman, who resided on one of the testator's

farms.  This household originally consisted of testator, Mr. Goodman and wife, and daughter Mary.  About three years before the will was made a young girl by the name of Bertha Howell was taken into the Goodman home as one of the family, also as a companion for the Goodman girl and to help with the house work.  A year or so before the will was executed Mrs. Goodman was taken to the insane asylum at Fulton, where she remained.

Everything appears to have been pleasant at the Goodman home up until about April, 1914.  Prior to that time the relations between testator and his son-in-law were pleasant.  The girl Bertha was then about fifteen years of age, and she and the daughter Mary slept in the living room downstairs.  The son-in-law slept upstairs.  He was in the habit of removing his shoes in the living room before retiring for the night and would leave his shoes by the stove downstairs. Early in the morning before the other members of the household were up it was his usual practice to come down to the living room, open up the draft on the stove, put on his shoes, start the fire in the kitchen and go about his work.

One morning in April, 1914, the daughter Mary was away from home.  The son-in-law came down as usual to build the fire, knocked on the living room door, and Bertha got up and unlocked the door and returned to bed before the son-in-law entered the room. He then entered the room and fixed the fire as usual and left the room.  Testator saw him leave the room and sometime later told him that he did not think it was proper for him to go into the room while the girl was there in the bed.  There was nothing in the evidence to show that anything improper occurred other than the above.

A few weeks later, the granddaughter Mary was entertaining a young man in the parlor one Sunday evening about nine p. m. Bertha was in bed in the living room.  The folding-doors between the parlor and

living room were closed. The son-in-law was upstairs. The testator was supposed to be in his room in another portion of the house. All at once a "terrible crash" was heard. Bertha raised up in bed, Mary opened the folding-doors and rushed into the room, and the son-in-law upstairs called out, "What is the matter down there?" When Mary rushed into the room she found the testator standing at the foot of Bertha's bed with a large post maul in his hand, which he had used in breaking open the outside door of the room. When he rushed up to the bed he asked Bertha where Ed Goodman was. He stared at Mary a few seconds and then left the room without saying anything further. In a few seconds the son-in-law went downstairs and to the testator's room and asked him what was the trouble. Testator replied, "Nothing, nothing, nothing." From that time on testator continued to tell his neighbors and persons with whom he would meet that he thought his son-in-law was intimate with the girl Bertha. He also told them that one Sunday afternoon no one was at the house except his son-in-law and Bertha and a little neighbor girl about eight years old, and that Bertha sent the neighbor girl to a near-by house with a note. Testator saw the little girl on the road with the note, and said that the little girl told him that Ed. Goodman was lying across the foot of Bertha's bed. The granddaughter Mary and the girl Bertha and the son-in-law Mr. Goodman each had many talks with the testator and tried to explain to him and reason with him that there was nothing wrong between the son-in-law and the girl, but they were unable to reason with the testator on the subject. Many of the witnesses to whom the testator told his troubles testified that testator was "off" on this subject, and that he became very much excited and agitated and nervous and did not talk intelligently when he was talking about the matter. Many of the neighbors tried to reason with him about the matter and to persuade him that there was nothing wrong, but they were unable to do anything with him in this regard.

It also appears in the evidence that testator was "in love" with the girl Bertha. That when she finally left the Goodman home and went to Mexico on a visit he wrote her a letter every day, and one day he wrote her two letters. It also appears that he wrote her a letter a day or two prior to his death. At another time he went to one of the banks in Louisiana and tried to borrow three thousand dollars, stating that he was going to send the money to Bertha for her use in buying a farm for herself. In talking to the banker he admitted that he was in love with the girl, and when asked why he did not marry the girl stated that he could not because he had promised someone that he would never marry, that he had offered up prayer to be relieved from this promise, but did not get any satisfaction or any release by that method.

About three months prior to the time the will was made the testator owned several hundred acres of farm land in Pike County. Prior to that time he had been a successful farmer and was considered a very shrewd business man. About May 26, 1914, testator deeded to one Robert Beasley, his nephew, a four-hundred-acre farm, the consideration being one dollar and love and affection. It appears that the testator raised Mr. Beasley when he was a young boy, and there was also some evidence that he thought as much of him as he did of one of his own children.

On July 6, 1914, testator gave his son, Ed. B. Wigginton, one of the plaintiffs herein, a valuable farm near Clarksville, Missouri, consisting of about 130 acres and also transferred to him seven shares of bank stock.

About August 1, 1914, testator sold the 240-acre farm known as the "Jim Ed. Griffith farm" to Doug Burns for the price of seventy dollars per acre. Many witnesses testified that this land was then worth one hundred dollars per acre (one or two witnesses said it was worth about seventy dollars per acre).

The evidence further shows that testator made four wills during the last three months of his life. All of the wills were drawn by an attorney who had not been

in the habit of attending to testator's law business. The first will was executed June 16th, the second July 9th, the third August 4th, and the fourth and final one, which is now in contest, August 8th. It appears, however, that the number of wills was caused by testator giving away and selling some of his farms which he had specifically devised in prior wills, and when he would dispose of a farm which he had specifically devised he would then go to the attorney and have a new will drawn. There were also some other changes made in the will. The placing of the property in trust was not provided in the first wills. The evidence upon the part of proponents undertakes to explain this by showing that in this community another young girl had been left a fortune and had run through with it within a short time after being married, and that the testator in order to avoid a similar occurrence with his granddaughter suggested that a trust be provided.

Mr. E. B. Rule, named as executor in the will, was cashier of the Mercantile Bank of Louisiana. Mr. May, the attorney who drafted the will, occupied offices above said bank. The testimony of both Mr. Rule and Mr. May tends strongly to prove that the testator was of sound mind at the time the will was made. Testator told Mr. Rule, however, that one of his reasons for making the will the way he did was to keep his son-in-law from having any benefit in any of his property.

Mr. Jasper Rubameier, one of proponents' witnesses, on cross-examination testified that the last year of testator's life he had a different look out of his eyes, that his face was drawn, and that he was more nervous and neglected his business. That on August 3, 1914, testator, in saying good-bye to the witness, cried and told him that if he never saw him any more he could have certain horses. This witness was one of testator's tenants, and stated that testator during the latter part of his life did not look after his farm as he usually did. This witness said "I kinda thought there was something wrong with him, I couldn't make out that it was." The witness said that the testator first began to act in this

manner in April, 1914, and he thought that testator must have been ''off his mind.''

James A. Goodman, a farmer whose farm adjoined the Griffith farm formerly belonging to testator, was a witness for the proponents. He testified that about August 1, 1914, testator told him of the trouble between himself and his son-in-law; that at this time the testator seemed mad and the witness did not think he was then capable of transacting any business. This · witness stated that he did not think the testator was mentally right, and that when he was telling him about the son-in-law and the girl he was very much aroused and excited ''and it looked to me like he had lost his reason.''

Plaintiffs' witnesses on the issue of testamentary incapacity testified substantially as follows:

Mrs. W. J. Smith, an acquaintance of the testator, met him on the train going to Mexico, one day in June, 1914. After carrying on a conversation for sometime testator arrived at his destination, and when he got up to leave touched the witness on the shoulder and said, ''Yes, but keep your mouth shut; I know something I can't even tell you; I am losing my mind.''

W. J. Buchanan, cashier of the Bank of Eolia, testified that testator was director in that bank until July 7, 1914, and was closely associated with the witness in business. That ''he noticed a change in testator in the spring of 1914, which gradually grew worse until he resigned as director on the above date. At the time testator resigned as director he stated that his mind 'was failing him.' '' Testator tried to tell the witness his family troubles, but the witness made excuses and avoided it. Without any proper objection being made, this witness was permitted to testify that in the summer of 1914 he thought testator did not possess sufficient mind to comprehend his property and his family relations or to transact business. On cross-examination, however, he said he thought the testator knew his kin-folks, knew what property he had, and that he knew he was making a will.

J. E. Tucker, merchant at Eolia and president of the Bank of Eolia, testified that "prior to 1914 testator took great interest in the bank's affairs, but that in the spring of 1914 he began to lose interest, and that at the time the testator resigned he made a speech to the board of directors; that his speech was in a way disconnected; that he mentioned several little incidents and then repeated them during the course of his talk;" that "he talked childish and not like the Mr. Wigginton I had known." This witness thought there had been a great change in testator's mind, and at the time he resigned "the board of directors remarked he was off."

David B. Bibb, director of the Bank of Eolia, testified that in 1914 testator's mind was not as good as it had been; that he seemed quite feeble and that when the witness looked at him "it impressed me that his mind was weak." The witness on cross-examination stated that he thought testator knew what property he owned, but that in talking he would make a statement, and then within a short time repeat the same over again, and that when he resigned from the directorship of the bank he stated that he realized he was getting old, and that his mind was getting in such shape that he did not feel that he was capable of passing on business any more. This witness stated that he did not think testator was competent to transact business of any kind.

Marcellus Henry, one of the directors of the Bank of Eolia, testified that prior to 1914 testator was a good business man, but that in 1914 he thought from his actions that his mind was growing weaker. He said, however, that it "might be" that testator understood ordinary business affairs.

Judge J. W. McIlroy, ex-county judge, lived on a farm just across the road from testator's home during the last fourteen years of his life. In the spring of 1914, witness states, testator looked haggard and troubled, and said that he was in great trouble, but did not state what the trouble was. The testator frequently came to witness's house and sat in the shade and talked and one day said: "I am in much trouble. I believe there is an

intimacy between Ed. Goodman and Bertha.'' Testator then told him about his suspicions and what he had observed, and that he did not think the son-in-law should leave his shoes down in the living room where the girl slept. Testator told the witness that he never saw anything wrong and never heard anybody else say there was anything wrong. The witness told testator that he did not think there was anything wrong, but was unable to convince the testator. The testator would continue to say, ''Ed Goodman had no business leaving his shoes down in that room.'' The witness stated that at the time the testator would mention this subject he was all wrought up and excited, and that he would tell the same thing over and over again; that witness would ask testator to quit worrying about the matter and the testator would say, ''Yes, I am going to quit it. I ain't going to think about it any more.'' That the testator would then cheer up for a while and would talk about different things, and probably in less than an hour he would come back on the same thing, saying: ''Ed. Goodman had no business leaving his shoes down in that room.'' Testator told the witness that he had ordered his son-in-law and granddaughter to move from the place, and that shortly thereafter he had changed his mind and apologized to them and told them they need not leave. Testator's conversation concerning the son-in-law and girl continued from the spring of 1914 until his death. Testator told the witness about knocking the door in with the maul—testator saying ''he heard talking and he couldn't sleep and it worried him and he suspicioned that Ed Goodman was in there with the girl,'' and he said ''he knew if he went to unlock the door or get in there they would get away, and he went out to the wood house and got a post maul and he came back and he smashed the door in and he went in and the girl was scared and she was in bed by herself, and Mary and her beau were in the parlor, and it scared them and he [testator] said, 'Where is Ed Goodman?' and about that time Ed Goodman appeared at the head of the stairs and said, 'What's going on?' and testator said, 'Then

I went back to my room.' " On one occasion testator asked the witness for advice concerning the disposition of his property and the witness told him that he was "not in any condition to convey property and it won't stand in law." The testator replied that he wanted to dispose of his property "so that Ed. Goodman could never get a cent of it." The witness told testator that he was doing wrong, and advised him not to give Bob Beasley the four-hundred-acre farm, and told him not to give him over one-fourth of it. The testator also said that he was going to entail the property he gave to Mary, so she could not sell it or that they could not take it for her debts and that Mary's children couldn't sell it until the youngest was twenty-one years old; that the testator agreed with him apparently, but that he could see by his countenance that he told him the wrong thing, and that testator never after that time asked him for advice about the disposition of his property, but that he would frequently come over and go over his old story about Ed. Goodman.

One day the testator came over to witness's house and said, "I want you to fix up and take me to Jacksonville to the asylum," and witness said, "Why, Mr. Wigginton, why do you want to go to the asylum?" and testator replied, "I can't stay at home, I fell out with those folks, I can't stay here and I had gone to Louisiana and stayed there and I can't stay there, this trouble is the sole cause of it, and I went out to Excelsior Springs and I tried to stay there and I couldn't," and he said that "something has got to be done, I can't stand this trouble," and the witness replied, "Mr. Wigginton, you are not crazy." At another time he told the witness he was "sick in body and mind," that his mind was so bothered that something had to be done or he could not live.

This witness stated that basing his opinion upon the conversation of the testator and his acts during July and August, 1914, he did not regard the testator as having a sound mind at that time.

Upon cross-examination he stated that testator had lucid moments when he was apparently sane, but that when he would get to talking over these family matters and talking about the disposition of his land and about Ed. Goodman, he became excited, and "then he would get off;" "his motive was to keep Ed. Goodman from handling any of his property." This witness further testified that he thought testator knew his property and his kin-folks, but that he did not think he was capable of making a will, and that he had allowed himself from imagination to think wrong about his son-in-law, and that he was carrying it out in making disposition of his property. Further on cross-examination the witness testified that his reason for telling the testator that he was mistaken about his suspicions concerning the son-in-law and the girl was "that he had known the girl under all conditions and I never saw anything wrong with her. I thought he [testator] did not know what he was talking about. I thought it was all imagination of a diseased brain, I thought then he was off and I think so yet." That on one occasion the testator said, "I want you to take me to Jacksonville to the asylum; I believe I am losing my mind." This witness further testified that he was a director in the Mercantile Bank of which Mr. Rule (the executor) is cashier.

Dr. J. M. Duncam testified that he had known testator for twenty years, and had treated him in a professional way the last fourteen years and so treated him in 1914; that the testator was suffering from insomnia, was very nervous and did not have much appetite. That the testator told the witness about some trouble between the girl Bertha and a negro boy, who also worked on the place, and that when talking about it he would flush up and become excited. The witness stated that at that time he did not think that testator was insane, but that he was not like he was when he was "strong-minded;" that the testator came to him in June and July and that his condition was "tolerable," but the witness did not hardly think him competent to attend to his business affairs. On cross-examination he testified

he thought testator had sufficient mind to know his property and children, etc., and that he thought he was capable of transacting ordinary business, but that he did not think he was able to appreciate the value of his farms and that he was not able to transact "extraordinary business."

Paul Cash testified that he had known testator fourteen years and in the summer of 1914 saw testator sitting in a buggy out at the side of the road where the buggy had stopped; that the hitch rein was dragging on the ground and that testator was talking to himself; that he got up within five feet of testator and spoke to him, but the testator never looked up; that he was unable to arouse him after speaking to him three times, and that the testator did not recognize him.

Dr. I. H. Miller testified that he had known testator for eighteen years, and had treated him professionally for eight or ten years prior to 1914, and had treated him in May and June in 1914. This witness said that having known testator as many years as he had he concluded early in 1914 that the testator's mind was very much impaired; that the name of his trouble was arterio-schlerosis of the blood vessels supplying the brain; that he was suffering with insomnia and vertigo and ringing of the ears and melancholy. He discussed with the doctor his suspicions about his son-in-law. The witness thought the testator was not capable of transacting business. On cross-examination the witness said that he tried to keep the testator from talking along the line "that he would get off on;" that the hardening of the arteries of the brain decreased the regular circulation through the brain and it had an effect on his mind, and that the hardening of the blood vessels of the brain had the effect to produce melancholy. This witness further testified on cross-examination that the testator did not talk intelligently "when he was going on about his son-in-law," and that the testator was "so agitated over it." The witness further testified that it was not so much the testator's talk as it was his demeanor that indicated insanity.

Dr. J. W. Crewdson testified that he had known testator for twenty-eight years; that he had treated him three times professionally in the summer of 1914; that testator told him of his trouble with his son-in-law and told him that his (testator's) mind was failing. From the witness's personal knowledge and observation he formed the opinion that the testator was incompetent to transact business "of any character involving any moment." Upon cross-examination the witness testified that testator was not capable of transacting anything that "would be dignified by the word business," and that if he sold hogs correctly it was merely an accident; that testator told him his mind was bothering him and that he was not in his right mind and that he had worried over his son-in-law's conduct with the girl; that his conversation was incoherent and disconnected and that he did not stick "lucidly" to any one subject; that the testator was not sane and that he was not of sound mind; that he did not intelligently describe symptoms, but only in a disconnected way; that the testator complained of "vertigo and dizziness and had loss of memory, halucinations and inability to recollect." On redirect examination the witness further testified that testator had the body of a man, but the mind of a child, and that he could not intelligently grasp any situation, and that he did not think that he had sufficient mind to appreciate the farms he had and their value as any intelligent man would.

Mrs. Lou Stark testified that she was well acquainted with the testator and frequently talked with him during the summer of 1914. The witness worked in the office of Dr. Miller. Testator occasionally came to that office for treatment, and would converse with the witness; he told her that he was in poor health, nervous and unstrung and did not know what he was doing, and that it was terrible to be in that state of health; he said troubles at home were worrying him; one day he came in the doctor's office, and the doctor was out and he stated to the witness: "I must have a talk with someone." She told him that he could talk to her. He then said that he

was in very great trouble with his family, and told of his family affairs in a very excited manner and seemed unusually nervous; stated that he had trouble with his son-in-law over a young girl he had taken to raise—that he thought the son-in-law too attentive to this young girl—that he (testator) loved the girl, and he did not care who knew it, and he did not want her mistreated; testator would then jump off of that subject on to something else, and spoke about making a will and said that he had promised all of his friends that he was going to give them some of his money, and that Ed. Rule had talked him out of that and had advised him what to do; he further stated that he did not have long to live, that he was a mental and physical wreck. He got up and walked over towards a table and after hammering on the table caught hold of witness's arm in an excited manner and said: "I don't know what to do, I don't know what I am going to do; I don't know what is the matter with me," then he turned around and took a few steps and again began telling about his troubles saying "that he had always promised that he would give his farm to his daughter Addie for her and her husband, and he had not done it, and that he had sold his farm, and that he did not know what to do about it."

Witness asked him if he believed those things he was saying about his son-in-law and testator said: "No, I don't know it to be true, but I don't know what to do. I don't know what to do. I have got no home now. Ed. and his wife have offered me a home with them, and I don't know what about the money, I don't know what about the money. Bud Jones told me I could fix me a room up there and live there and it would not cost me a cent." Witness stated to him that it was so unlike him to talk about his troubles, and testator replied: "I know won't anybody around Dover believe me, they will believe Ed. Goodman because he is a good neighbor; they will believe him, they won't believe me."

On another day about August 1, 1914, testator again called at the office, and told the witness that he did not have any home and that he did not know what to do,

and asked the witness if she would take care of him the rest of his life if he would give her sufficient money or would give her the money he had. Witness told him he was not capable of making any proposition like that, and that his money belonged to him and the children and she refused to consider it. At this time the testator was excited, walking about the room; his voice was husky and the witness saw him wipe his eyes. She states that he cried, but that she did not see any tears. Witness gave it as her opinion that he was insane and unbalanced and did not think he was "competent."

On cross-examination witness stated that she had known testator for thirty years, and that she did not think he knew how to attend to business the last time he was in the office; that his conversation was disconnected from beginning to end; that he used the word "damn" which was unusual for testator; that he was "damning" his son-in-law for interfering, and stated that he was not going to give him any of his money. The witness was asked the question if she thought he was crazy because the testator did not want to turn his money over to his son-in-law, the answer was as follows: "Yes, sir. If you heard as many different things said about any one man as Uncle Cal was in the habit of saying about Ed. Goodman in the years gone by you would think there was something seriously wrong."

J. C. Johnson, who married a niece of the testator, testified that he saw testator often in 1914 and that his farm was near the farm which the testator gave to Bob Beasley; testator told witness about his son-in-law and the girl, and the witness told him that he might be mistaken; testator said he could not be mistaken, and kept bringing up the subject about the girl and the son-in-law; prior to that time he had always spoken very kindly concerning the son-in-law. The witness was of the opinion that testator did not have sufficient mind to comprehend business transactions and realize his relations to his own family.

Upon cross-examination this witness admitted that he rented wheat ground from testator after the above

conversations, and bought seed wheat from him in July; testator said that he thought about as much of Beasley as he did about his own children and that he had given Beasley the old home place, and that he had first made a will giving practically everything to his granddaughter Mary, but that since his trouble with the son-in-law concerning the girl he thought if Mary died before she married or did not have any children his son-in-law would get everything he had and he wanted to change it, and said that he was going to leave Addie and also Ed. some.

James E. Pew, one of the attorneys of record for the proponents, was called as a witness by the plaintiffs. He testified that in April, 1914, testator had him prepare a notice for Ed. Goodman to vacate the farm; that the testator also asked him to write a will; that the testator at that time had an intense feeling toward Goodman on account of his suspicions concerning the girl. The witness discouraged testator in his desire to make a will, and said to him, "I won't write a will for you today, I don't think a man in your condition should write a will at this time, or in your condition; I said, you are exercised, you are out of humor with your son-in-law, and you are telling me about this girl down there, and in the general condition your mind is in today I don't think a man should make a will, and when he does I think he should be in peace with his family and friends when he makes a will, and for that reason Cal I won't write a will for you." The witness further said: "My further reason for not writing that will was another personal reason; it was a family matter, and he had described how he disliked Goodman on account of his treatment to this girl, and I thought all of them being in the family it would be better that I, as a lawyer, would advise him not to write it at that time. Those were my reasons." On cross-examination the witness said that he did not refuse to write the will because the testator was crazy, but because he thought testator was in a bad humor with the members· of his family. He also stated on cross-examination that in his opinion testator knew his property, its value and his children and relatives.

Len Butts testified that he saw testator at a funeral in the summer of 1914, saw him leave the crowd and go out by himself and sit in a buggy where he sat looking down at the dashboard and talking to himself; that his acts were not natural, and that he was in deep thought about something and seemed "all to pieces."

Jeff Estes testified that testator told him that his mind was getting off and that he could not remember things; that at one time testator wrote him a letter about selling him a farm, and when the witness called to see him about it testator did not remember anything about the letter; that in his opinion testator did not have the mental capacity to understand business transactions and to realize his relations to the members of his family. On cross-examination he stated that the testator knew his property and kinfolks.

Herbert Farrell testified that while Sam Brown was running a threshing machine in the neighborhood the testator had been out to the machine two or three prior times, but later came out to where the machine was working and said "he hadn't seen Sam Brown thresh a bundle of wheat since he started out." The witness had seen him at the other places, and from the above remark thought he was crazy, and he also gave it as his opinion that the testator did not have sufficient mind to transact business and to realize his obligations to the members of his family.

Frank Estes testified that in February, 1914, some men were at work removing a snow drift in the road and that he met testator in the road and testator asked him if he thought "they would let him see it" (the snow drift); on June 4, 1914, he saw testator at the breakfast table in a hotel in Louisiana and testator asked witness where he had been. Witness told him he had been to St. Louis to sell stock, and in three or four minutes testator asked him the same questions over; two weeks later testator did not recognize witness at his home; witness went to testator's home to deliver mail to a young lady visiting them. Testator said he did not know anybody was visiting

275 Mo.—28

them. (It appears from other evidence in the case that testator had assisted the granddaughter and visiting girl in hitching up a horse on this same morning.)

In the latter part of June, 1914, witness met testator on the road and testator said to him, "I see you on the road often, but I don't know you." On August 4, at Clarksville, testator shook hands with witness and asked him who he was; the witness had lived near him since 1901 and had seen him frequently during that time.

The witness stated upon cross-examination that he might be capable of telling who his children were and of what property he owned, but he did not think testator had mind enough to comprehend the value of his property.

J. M. Givens, who had known testator for more than forty years, stated that he had a conversation with testator at the hotel in Louisiana during the summer of 1914; testator told him of his suspicions concerning the son-in-law and the girl; told him about breaking the door down with the maul. The witness stated that testator "was all to pieces," and that he did not think he was competent to attend to business; the witness tried to reason with testator concerning his belief about the son-in-law, but was unable to change testator's mind.

Witness further states that he did not think testator was mentally competent to make a will at that time; that they would be having a conversation in front of the hotel and testator would ask him a question and tell him something, and then in less than ten minutes he would tell the same thing over or ask the same question again. Witness stated that he thought testator knew what property he had, but he doubted if he knew its value, and he doubted very much if testator had mind enough to retain matters in his mind long enough to make a will.

Upon cross-examination the witness testified as follows: "He had brooded over these things we just spoke about awhile ago and he became partially unbalanced from them, not crazy, I wouldn't say Cal Wigginton was crazy, but a man can brood over things, one thing, until he becomes partially unbalanced." At one time testator said to witness, "I am just all to pieces."

C. C. Tague testified that testator told him of his suspicions about his son-in-law and the girl, and that he objected to his son-in-law leaving his shoes in the room where the girl slept, especially in the summer time; testator said he never saw anything, but only had suspicions; witness tried to reason with testator, but testator said "there ain't no doubt, there ain't no doubt." The witness thought testator's "whole mind was on Goodman and the girl."

On cross-examination witness said, "I don't think he [testator] was competent to know them [his children] when I saw him the last time; when a man is raving, aquoting Scriptures, and standing in his buggy and making speeches he ain't fit to do business or nothing." Witness further said: "No, sir, I judge from his (testator's) eyes, the look in his eyes, and on the other hand his talk and abuse, that he was not competent to do business with nobody."

The witness stated that he thought testator was wrong in his belief about his son-in-law and said: "He did not give me any reason for not being wrong."

Wm. B. Haley testified that he had known testator for fifteen years and at the time the will was made was assistant cashier of the Merchants Bank of Louisiana, and also wrote fire insurance and had written testator's fire insurance; that he was well acquainted with and was on friendly terms with the testator; that some time in the summer of 1914 testator came to the bank and asked to see the witness in the directors' room; they went into the directors' room, and there the testator started to read a letter but broke down crying, and could not finish reading the letter. He then handed the letter to the witness; the letter was from some town in Illinois, and the witness thought it was signed by a lady whose first name was Bertha.

From the witness's memory he testified the letter contained the following: "Dear Mr. Wigginton, I have found a piece of property over here that I would like to own and it can be brought for three thousand dollars, and [either] please send me the money" or "I am sure you

will send the money when you know I want it.'' Testator told witness that the writer of the letter was a girl who had been living at Ed. Goodman's, and he stated to the witness that he wanted to borrow three thousand dollars and send it to her. He further said: ''The girl is the sweetest and nicest girl that I have ever known; she has taken more interest in me than anybody.'' Testator stated that he would give a deed of trust on the Griffith farm to secure the loan. The witness tried to make the loan, but could not do so, and testator was very much exasperated a few days later when witness told him he had not been able to get the loan. Later testator told witness that he was going to sell the farm and get the money and that the witness need not try to borrow the money for him.

Testator told witness that he had made him executor in his will, but did not say anything about making Rule co-executor. Testator told the witness some complimentary remarks that he had heard about him, and appeared to be very friendly with him. The testator said he thought Goodman was in love with Bertha Howell, and that he did not like it ''a little bit.'' He told the witness that one morning he heard a noise in the girl's room and went in and saw Ed. Goodman in there and asked him what he was doing and Goodman said he was building a fire.

Testator said he was so worried about this girl affair down on the farm that he could not sleep, and that he could not stand it any longer.

At another time the witness accused testator of being in love with the girl, and the testator said: ''You seem to understand me.'' The witness advised testator to marry the girl. Testator said he was too old to marry anybody, and furthermore he had promised either his wife or sisters that he would never marry, and said: ''I have gone on my knees and talked to my God on several occasions about breaking my word and I have never got any satisfaction out of the Lord about breaking my word and I have not broken my word to get married.'' He further stated that if he would marry that ''would beat

Ed's time." Witness stated that during the latter part of the summer of 1914 he did not think the testator had mind sufficient to know the value of his property and appreciate his relations to his family.

The testator later told the witness that he had changed his will, but he never told him that he had changed executors.

Mrs. Cora E. Ogden testified that she had known testator all of her life; that she had a home in Pike County, and that in the summer of 1914 she accompanied her married daughter to the train. Testator asked the witness if she was going to Illinois to make her home with her daughter, and said that it would be a nice thing for her to do. Witness thought the testator's question a strange one since she had a home and husband in Pike County. She thought testator's mind was weak when she talked to him and that in the last of June, 1914, his eyes "looked very glassy" and he did not "seem as he always seemed."

Ed. Ogden who had known testator all of his life stated that he met testator on the street one day, and testator said that he wanted to see him on business and asked him where he could find him in ten minutes. The appointment was arranged, and witness went to the appointed place. Later testator came in, sat down, picked up a paper and began reading. The witness sat around for a half an hour. The testator did not say anything further and the witness left.

On August, 1914, while at Sunday school testator said to the witness, "Ed, do you think that Eureka Springs water would sprout hair on your head?" The witness further testified, "It made me kinda look and think" (upon cross-examination the witness stated that he did not think that testator was joking), and further stated that the testator was not looking good that day; "that he put his book up before his face in the Sunday school class:" that "they all thought he was looking at the Sunday school lesson and I could see he was not, he was muttering and sometimes he would make a noise and sometimes he would not. His lips was moving and finally

he dropped over to sleep." "His eyes looked kinda funny while the preaching was going on."

He further testified that "lots of times" in the summer of 1914 testator did not have mind enough to appreciate the relations to his family or know the value of his property.

C. A. Patterson, 85 years old, uncle of Ed. Goodman, testified that in the summer of 1914 testator said to him: "I appointed myself a guardian, and have turned them over all my papers a few days ago." This witness also said that in the summer of 1914 he saw testator on the street and said to him: "I came down here to have a special talk with you today; several people from the neighborhood down there said you were crazy." Testator told witness that he was then in a hurry, and made an appointment to see him later, but instead of keeping the appointment left town. Witness did not think the testator was competent to attend to business.

Mary O. Goodman, granddaughter of testator, twenty-two years old, testified that Bertha Howell was brought to the Goodman home about three or four years before the trial; that she was sixteen years old at the time of the trial (the trial occurred February 11, 1915); that she and Bertha slept together during the last two years and kept their things in the same room; that they both did housekeeping and went together to Sunday school; that her grandfather accused her father of being intimate with the girl, and that she told him that he was wrong and that he said, "No, indeed," and shook his fist in witness's face; witness talked to him every week about it, but was not able to reason with him. The witness then relates the incident when the testator broke the door down with the post maul, and in this corroborated the statement heretofore made; the witness stated that she was unable to persuade the testator out of his thought about her father and the girl, but when he talked about it he became all excited and would get up and walk around and sometimes would swear; that sometimes he would seem all right for a little while, and then he would begin talking about her father and this girl; that

her father tried to reason with him, but it did not have any effect; that prior to this trouble her grandfather treated her father all right, and said there was not a better living man; that he changed his attitude toward her father in the spring of 1914; she further testified that she did not think her grandfather was capable of transacting ordinary business or understanding his relations to his children in the summer of 1914. On cross-examination she testified that she had asked her grandfather to buy back the farm from Doug Burns; and that outside of the one subject about Bertha and her father her grandfather talked rational. Several post cards which the testator had written the witness were read in evidence. The post cards were as follows:

"Clarksville, Aug. 26, 1917.

"Miss Mary Goodman, Eolia, Mo.,

"Dear baby love will try and drop you a few lines to let you know that I could not stay at the Springs Mary forgive if you can your poor old miserable old granddad Oh how I regret haveing treated my baby as I have I think I will go to Boles tomorrow but go with a sad heart for haveing treated my only dear baby as I have good by little darling forgive oh forgive if you can from your poor miserable old grandpa.

"Clarksville, Aug. 26.

"Mary Goodman.

"My own and only dear baby you dear little darling oh how I have suffered I don't see how I could treat you as I have oh you dearest being on earth to me if your dad had not talked so rough to me I would not have done as I did good by you dear little darling forgive if you can.

"Eureka Springs Ark.

"Miss Mary Goodman

"Dear little darling, pray for and forgive me for what I have done and for what I am about to do I don't want to live any longer if Ed had not kussed and abussed me things would have been different oh you dont know

what I have suffered can write no more good by forever your in love.

"C. W.

St. Louis, Aug.

"Oh you darling baby you will forgive me and love me still no one knows how I have suffered pray for me and forgive the last act of my life I wish I could but I cannot I would like to see you once more to hear you say you forgive oh you little sweet darling.

"Good by remember in love and kindness I am so sorry I sold your home I did not think I was so worried good by."

Another post card addressed to this witness and found in the pocket of testator after he had committed suicide read as follows: "I do this to keep out of the asylum as I feel I will have to go good by to all the world."

Bertha Howell testified that she had lived at the Goodman home for three years and that she was sixteen years old; that Ed. Goodman treated her just like a father, and had never made any improper remarks to her and had never attempted any improper act towards her; that on one occasion a little girl was visiting the Goodman home and she sent the little girl with a note to a neighbor; that when the little girl returned the note it was the same one she had sent, and that she sent the little girl back for the answer. Mr. Goodman was not with her in the house at that time. She thought he was out on the front porch.

Witness also relates the incident of testator knocking down the door with an iron maul; that at this time Mr. Goodman called from upstairs asking what was the matter. She also stated that Mr. Goodman had not been alone with her in that room that night; that the room that she occupied was used as a sitting room for the family; that Mr. Goodman had always left his shoes there when he retired and would always make the fire in the morning. The witness argued with the testator that he was mistaken, but that it would do no good; that he seemed excited and awfully nervous; that one time testator told

her that after the time for making fires was over I think Mr. Goodman would quit leaving his shoes in the room; that one or two nights during the year when Mary was away from home she slept by herself in this room; that she said to testator, "Grandfather, you are mistaken," and that he replied, "I hope to God I am," and commenced crying.

Testator told witness he did not believe he could live on the farm without her; the witness, however, decided to leave the Goodman home, stating that it was testator's home and that she thought she should leave; she left in July and went to Mexico for a week, and testator wrote her a letter every day and on one day wrote her two letters; that testator also came to Mexico and gave her fifty dollars with which to buy clothes; that later in Louisiana testator asked witness if she would forgive him for what he had said about her saying that he was crazy and did not know what he was saying. The witness returned from Mexico again to the Goodman home, remaining about a week and then left, thinking that perhaps if she would leave testator would come back to his home. Witness denied that she had written him asking for three thousand dollars.

Ed. Goodman the son-in-law testified that he never treated Bertha Howell in any other way than as a father would treat his daughter, and that nothing out of the way had ever occurred between them; that it was his habit to build the fires in the morning, and one day when his daughter was away he noticed the testator watching him; that he tried to persuade the testator there was nothing wrong, but could not do anything with him. Later the testator said he could not stay there if the girl was to stay, and the witness then told him they were thinking of finding another home for the girl; at one time testator told witness that he (testator) was crazy; that at one time the testator in abusing him about the conduct of the girl threatened to disinherit his daughter, and the witness said to him, "You can do as you damn please with your property," and another time he also told the testa-

tor that he was telling a "damned lie" about himself and this girl; the testator served notice on the witness to vacate the property, and later he withdrew the notice and apologized. The witness said that he did not think the testator realized what he was doing. On cross-examination the witness said that the testator had given his wife sixty-five acres of land in the year 1893; he also said that he thought testator knew his property and the natural objects of his bounty, and that he thought he would know what was in the will.

Ed. B. Wigginton, 53 years of age, son of testator and one of plaintiffs herein, testified that on July 2, 1914, his father first told him about his troubles with Goodman; that his father at that time had a different expression on his face, a different look on his face to what he had been accustomed to seeing, and when he began "to tell me about his trouble he become excited and agitated" and, "I don't believe he cried at that time, but he was very agitated, excited and worked up about it;" that on July 6th his father mentioned the subject again, and cried when he was talking, and told him about the incident when Bertha sent the little girl away with the note, and also of the time he broke the door down; that about the first of August he went over the story again and at that time he was very weak, feeble and tottering in his walk. Witness also stated that on July 2, 1914, testator made him a deed to the farm near Clarksville, and that he was also present part of the time when testator made his will of August 8th, but that he was not present when the will was signed; that he took his father to Eureka Springs on August 9th; that while on their way and when they had arrived at Seligman testator broke down and began crying and said that he could not go any farther, that he had to go back, that he felt like throwing himself under the car wheels. Witness stayed a week with him at Eureka, and then left him there in the care of other people. About a week later testator returned to his son's home at Clarksville.

Witness stated that he did not think his father was rational during the summer of 1914, and that he did not

think his father comprehended the transaction when he deeded him the 130-acre farm near Clarksville and assigned to him the bank stock; that he thought testator was then insane; that testator never mentioned his insane daughter's name in the summer of 1914.

When asked upon cross-examination why he did not refuse to receive the deed to the farm he stated that he did not refuse the deed because he knew if he got it "somebody else wouldn't." He further testified that on August 1, 1914, testator did not act like he knew what he was doing, but seemed dazed (this was the day he delivered the deed to the witness). While testator was at the Springs he wrote his son the following letter:—

Mr. E. B. Wigginton

"Dear son if anything happens to me I wish you and Bobb would help to pay my funeral expense and toombs stone as it will be hard on Mary to pay it all I dont want a large and expensive stone as I dont deserve it you people be very kind to Mary I feel that I have done her badly dear little baby darling my own and only grandchild. pitty oh pitty me oh how I have suffered remember me in kindness farewell pitty oh pitty me."

In rebuttal the proponents offered testimony tending to show that testator was suffering with a cataract during the summer of 1914, which accounted for his inability to recognize people whom he had formerly known.

I. We are unable to agree with appellants' contention that the court erred in refusing their peremptory instruction. We have painstakingly set forth in the foregoing statement the facts bearing on the issue of testamentary incapacity. It would be but a repetition and therefore useless to reiterate the same here. The whole evidence carefully considered, we have reached the conclusion that it was sufficient to authorize the submission of the issue of *devisavit vel non* to the jury.

Testamentary Incapacity.

The facts presented by the record in the case at bar are even stronger then those held in judgment in the recent case of Thomas v. Thomas, 186 S. W. 993

(not yet officially reported), wherein it was held by Court in Banc that the evidence of testamentary incapacity was sufficient to go to the jury.

II. It is further contended that the court erred in instructing the jury on the question of an insane delusion. Respondent's instructions numbered 2 and 3 on this issue were as follows:

"2. The court instructs the jury, that if you believe from the evidence in this case, that at the time Calvin Wigginton signed the paper read in evidence, purporting to be his last will and testament, he was possess-

**Delusion.**

ed of a false and mistaken conception and belief of an unduly intimate relationship existing between one Ed. Goodman, his son-in-law, and a young girl, an inmate of the said Goodman's home, and was also laboring under such false and mistaken conception and belief, if the jury so find, of such intimate relationship, at the time he executed said instrument of writing, and if you find that there was no evidence of any such intimacy, and no foundation in reality, for any such conception or belief, but that such conception and belief was false, and said Wigginton could not be reasoned out of it, and was incapable of divesting himself of such conception and belief, but acted on it in executing said instrument of writing, as being true; and that this false conception and belief, if the jury so find, solely determined the disposition of his property, contained in said instrument, then the jury will find that said instrument of writing is not the last will and testament of said Calvin Wigginton.

"3. The court instructs the jury, that an insane delusion, as referred to in other instructions, is a conception originating spontaneously in the mind, without evidence of any kind to support it, which can be accounted for in no other reasonable hypotheses, having no foundation in reality and springing from disease or a morbid condition of the mind, and the person laboring under the same cannot be reasoned out of such conception; that, whenever a person imagines something extravagant to exist, which really has no existence whatever, and he is

incapable of being reasoned out of his false belief, he is in that respect insane.

"And if the jury believes from the evidence that the instrument of writing, read in evidence, signed by Calvin Wigginton, was the fruit or off-spring of such delusion or false conception and that said Wigginton could not be reasoned out of said delusion, if any, then they should find that said instrument of writing is not the will of Calvin Wigginton, and this is true, although they may believe that said Wigginton was sane and rational upon other subjects, and capable of transacting ordinary business."

As we understand appellants' position as outlined in their brief they raise no question as to the form of the instruction, but contend that there was no evidence of an insane delusion upon which to base the instruction.

The appellants (proponents) asked the following instruction:

"The court instructs the jury that even though you find and believe from the evidence in the cause, that Calvin Wigginton was laboring under a delusion, in respect to the relations between his son-in-law, Ed. Goodman, and Bertha Howell, and that he was unable to rid himself of such delusion, still you cannot find against the will, merely because of such delusion and his inability to rid his mind of it."

The court gave appellants' above instruction after properly adding the following clause, to-wit: "provided such delusion, if any, did not govern or control his mind at the time of execution of the instrument of writing read in evidence as the last will of said Wigginton, as defined by other instructions in the case."

Appellants' instruction numbered 6 also instructed the jury what to do in the event they should "find and believe from the evidence in the cause that Calvin Wigginton was insane and was laboring under delusions both before and after the date of the execution of the paper writing purporting to be his will."

It appears from the foregoing that even the appellants' instructions submitted the case on the theory that

there was evidence tending to show that testator was possessed of an insane delusion concerning the son-in-law and the girl. Respondents insist that it is a sufficient answer to appellants' present position to say that the case here should be reviewed upon the same theory upon which it was tried by appellants below. But putting aside this reason, which if applied to the present situation might appear to be somewhat strained, we will state we think there was sufficient evidence to make the question of an insane delusion one for the jury.

In the case of Knapp v. Trust Co., 199 Mo. 640, l. c. 667, GANTT, J., speaking for the court, quoted with approval the following definitions of an insane delusion, viz: "Whenever the person conceives something extravagant to exist, which has in fact no existence whatever, and he is incapable of being reasoned out of this false belief, it constitutes insanity" and "whenever it appears that the will is the direct offspring of the partial insanity or monomania under which the testator was laboring, it should be regarded as invalid, though his general capacity be unimpeached." And further, "An insane delusion has been variously defined to be a belief in something which no sane person would or could believe, something in the nature of things impossible, or which has no foundation in fact . . . An insane delusion is a belief induced by insanity. The error is simply a means of detecting it, and not always satisfactory at that." And further, "To invalidate a will it must appear that the testator was subject to a delusion as to the facts within his own observation, in the existence of which he actually believed, which a rational man, from the use of his senses, under the same circumstances would have known not to exist." [Id. l. c. 667-8.]

To the same general effect are the following authorities: Benoist v. Murrin, 58 Mo. 307; Holton v. Cochran, 208 Mo. 314; l. c. 404 and 418 et seq.; Buford v. Gruber, 223 Mo. 231, l. c. 248 et seq.

In the case of Fulton v. Freeland, 219 Mo. 494, l. c. 517, GRAVES, J., said: "There is no such thing as a delusion founded upon *facts*. It is a mental conception in the

absence of facts. If the idea entertained has for a basis *anything substantial* it is not a delusion." (Italics ours). The above is in full harmony with the cases above cited.

·It is true in that case the.following was quoted from a Nebraska case viz.: "No belief that has any *evidence* for its basis is in law an insane delusion." (Italics ours.)

But the word "evidence" in the foregoing definition has reference to the evidence which the testator may have had before him at the time he formed the belief. It cannot have reference to the evidence which may be offered upon the trial of the case, because if it did, the mere presence upon the trial of any testimony tending to show that testator had some evidence for such a belief, would, *ipso facto* and as a matter of law, determine that there was no insane delusion, and the jury, although there was a conflict of evidence upon that point, would be deprived of determining the real issue of fact, viz., did testator have before him evidence acting upon which any normal or rational mind would have formed such a belief? Whether a given testator did or did not have before him a sufficient evidentiary basis for such a belief is in many instances a question for the jury.

If appellants' theory be the correct one, the issue of mental delusion would in many instances be improperly taken away from the jury. We are unable to agree with appellant's contention in this regard.

The additional cases of Conner v. Skaggs, 213 Mo. l. c. 348, and Sayre v. Trustees, 192 Mo. l. c. 126, cited and relied upon by appellants are so different in their facts from the case now held in judgment as to be of little help as precedents in the instant case.

In the instant case there is testimony from which the jury would be justified in finding that testator was insane on the subject that an illicit intimacy existed between his son-in-law and the girl Bertha; some of the witnesses say he was "off" or "unbalanced" on this subject; that he did not talk intelligently or rationally about it; that there was no sufficient foundation for such a belief; that it was constantly on his mind during the summer of 1914; that his closest friends and life-long neighbors could not

reason him out of this belief; that it so worked on his mind as to cause him to write his will the way he did. (If the property had not been placed in trust as it was the son-in-law as guardian of the insane daughter and as father of the granddaughter would necessarily have had much to do with the control and management of the property).

Applying the rule announced in the above cases we think there was evidence sufficient to justify the jury in finding that testator was possessed of an insane delusion on the above subject and that it determined the disposition which he made of his property. This being true it follows that the court did not err in submitting that issue to the jury.

III. We find no error in the admission of the post-cards from testator to his granddaughter written by him a few days after the will was executed. They were competent evidence of his mental condition. Appellant contends that they were too remote. No hard-and-fast rule can be stated concerning the competency of this character of evidence. In the case of Story v. Story, 188 Mo. 110, l. c. 127, LAMM, J., quoted the applicatory rule as follows: "No rule of competency can be stated, except the rather vague one that evidence of mental condition prior or subsequent to the making of the will must be sufficiently near in point of time to aid in determining the testator's condition at the time of making the will; and whether or not it is too remote is a question for the court to decide."

**Remote Occurrence.**

In the present case it does not appear that there was any noticeable change in testator's mental condition between the time he executed the will and the time he wrote the post-cards. Only a few days elapsed between the two dates. Under such circumstances we are unable to say that the evidence was too remote.

IV. It is further contended that the court erred in permitting lay witnesses, over appellants' objection and

exception, to invade the province of the jury by giving

Opinions. their opinions to the effect that testator did not have sufficient mind to know the value of his property, or to realize his relations toward his children, etc.

In the recent case of Heinbach v. Heinbach, 274 Mo. 301, the case now relied upon by appellants, FARIS, J., announced the rule, to which we still adhere, that a witness in a will-contest case should not be permitted to invade the province of the jury by expressing his opinion on the very question the jury is to determine, to-wit, the question of the mental capacity or incapacity of a person to make a will, as well as the several elements which go to make up such mental capacity, viz, ''mental capacity to comprehend who his children were, to understand the nature and extent of his property, and to know to whom he desired to give it.'' ·

But we are of the opinion, for the reason given below, that the above rule cannot properly be applied in the present case.

᾿ Upon the oral argument we were of the opinion that the case would have to be reversed on account of this alleged error, but upon reading the voluminous record in the case we discover that all through the proponents' case in chief and upon the cross-examination of many of respondents' witnesses the proponents (appellants) themselves opened wide the door for the admission of this kind of evidence, and asked many of the witnesses the direct question as to whether or not in their opinion the testator ''knew his children or kin-folks, or knew what property he owned, or knew who were the natural objects of his bounty.'' No objections seem to have been interposed by either side to this line of testimony for some time during the progress of the trial. After the trial had proceeded for some time and apparently after appellants had been able to produce about all of this kind of testimony which was favorable to them they seemed to have then come to the conclusion that such testimony invaded the province of the jury and interposed such an objection

275 Mo.—29

to a part of similar testimony offered by the plaintiffs during the later portion of the trial.

After appellants by their conduct had invited this line of inquiry they should not now be heard to urge it as error. One of the fundamental rules governing trial conduct is that self-invited error cannot be made the basis of complaint. [Rourke v. Railroad, 221 Mo. 46, l. c. 62 and cases cited.] The application of this rule has most generally occurred in cases where the self-invited error came by way of instructions requested, yet no valid reason would appear to prevent its application to self-invited error in whatever form it may have appeared and we have no hesitancy in saying that it should be applied to the situation now held in judgment.

V. It is further contended that the court erred in refusing to give appellants instructions number 4 and 5. Instruction 4 is as follows:

"The court instructs the jury that if Calvin Wigginton had died without a will, or the paper writing in controversy be held not to be his will, then in Inheritable neither event would Mary O. Goodman, his Interest. granddaughter, inherit any interest in his estate."

Instruction No. 5, is as follows:

"The court instructs the jury that under the evidence in the cause, you will find that the paper writing in controversy, purporting to be the will of Calvin Wigginton, Formal was executed in conformity with the provisions Execution. of the law relating to the execution of wills, and you will find that issue in favor of the proponents, that is, in favor of those seeking to uphold the will."

Instruction 4 contains a correct statement of law, but we are unable to see wherein the legal information contained in this instruction could in any proper manner aid the jury in determining the issue of whether or not the testator had sufficient mental capacity to make a will. We hold therefore that its refusal was not error.

Neither did the court err in refusing instruction 5. There was no controversy about the "formal" execution of the will and there was no likelihood that the jury would go astray on that point. Furthermore the instruction in the form requested was likely to mislead the jury; in fact, we entertain some doubt ourselves as to just what thought appellants *may have intended* to convey by the phrase "was executed in conformity with the provisions of the law relating to the execution of wills." Strictly speaking it cannot accurately be said that a will executed by a person lacking testamentary capacity is "executed in conformity with the provisions of law relating to the execution of wills," this because the law requires the execution to be by one of sound mind.

The judgment is affirmed. All of the judges concur.